1    Joseph H. Fagundes, Esq. #95264
     Thomas M. Gray, Esq. #265212
2    CASSEL MALM FAGUNDES
     6 El Dorado South, Suite 315
3    Stockton, CA 95202
     Telephone: (209) 870-7900
4    Fax: (209) 870-7922

5    Attorneys for Plaintiffs
     GREGORY K. TUCKER and REBECCA
6    TUCKER

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10                            OAKLAND DIVISION

11

12   GREGORY K. TUCKER and REBECCA      )    Case No. C 11-03086 YGR
     TUCKER,                            )
13                                      )
                   Plaintiffs,          )    **PLAINTIFFS' OPPOSITION TO**
14                                      )    **DEFENDANT'S MOTION FOR**
     vs.                                )    **SUMMARY JUDGMENT ON ALL**
15                                      )    **CAUSES OF ACTION.**
     WRIGHT MEDICAL TECHNOLOGY,         )
16   INC., WRIGHT MEDICAL GROUP, INC.,  )    Date:   January 15, 2013
     and DOES 1 through 100, inclusive, )    Time:   2:00 p.m.
17                                      )    Action Filed: May 6, 2011
                   Defendants.          )    Trial Date: April 1, 2013
18   _____)

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

3    I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4    II.    STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

5           A.    Mr. Tucker's Medical History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

6           B.    The Profemur Hip System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

7    III.   STANDARD OF REVIEW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

8    IV.    PLAINTIFF'S EXPERT TESTIMONY IS ADMISSIBLE AND THE
9           DECLARATION OF DEBBY DAURER SHOULD BE EXCLUDED . . . . . . . . . . . . . 5

10   V.     PLAINTIFF'S NEGLIGENT DESIGN CLAIM IS VIABLE AS PLAINTIFFS
            HAVE SHOWN THAT DESIGN PROXIMATELY CAUSED MR. TUCKER'S
11          INJURY AND THE RISKS FAR OUTWEIGH THE BENEFITS  . . . . . . . . . . . . . . . 6

12          A.    Wright knew or should have known of the risks associated with a
                  modular design and the choice of titanium alloy for the long neck
13                and had actual knowledge of fractures occurring . . . . . . . . . . . . . . . . . . . . . 7

14          B.    Wright's testing was inadequate for the U.S. population . . . . . . . . . . . . . . . . . 8

15          C.    Mr. Tucker was a targeted and foreseeable consumer within the
                  normal distribution of the U.S. population and Wright actively marketed
16                the device to younger high demand individuals . . . . . . . . . . . . . . . . . . . . . . 9

17          D.    Safer alternatives were available to Wright such as surface treatments,
                  use of a stronger material, a geometry change to the taper, or the use of
18                better warnings and these alternatives were available when Wright
                  began marketing their device in the U.S. and at a minimal cost . . . . . . . . . . . . . 9

19
            E.    Wright Medical's long neck fracture rate does not compare favorably to
20                those rates reported in the literature . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

21          F.    Wright's reliance on a similar case is misleading and California law
                  was not applied in Cappellano v. WMT . . . . . . . . . . . . . . . . . . . . . . . . . 13

22
            G.    The defective design of the ProFemur long neck is the proximate
23                cause of the fracture and injury to Mr. Tucker . . . . . . . . . . . . . . . . . . . . . 14

24   VI.    PLAINTIFFS STRICT LIABILITY DESIGN DEFECT CLAIM IS
            VIABLE FOR REASONS PREVIOUSLY DISCUSSED . . . . . . . . . . . . . . . . . . . 14
25
     VII.   PLAINTIFF'S MANUFACTURING DEFECT CLAIMS UNDER
26          STRICT LIABILITY AND NEGLIGENCE ARE SUPPORTED BY
            THE FACTS IN THE RECORD AND A GENUINE ISSUE OF FACT EXISTS
27          BETWEEN THE METALLURGISTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

28

CASSEL MALM FAGUNDES
6 S. El Dorado St., Suite 315
Stockton, CA  95202
(209) 870-7900

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON ALL CAUSES OF
ACTION                                               i                                      00099996.WPD

VIII.   PLAINTIFF'S STRICT LIABILITY AND NEGLIGENT FAILURE
        TO WARN CLAIMS SHOULD DEFEAT SUMMARY JUDGMENT
        AS THE FACTS SUPPORT THAT WRIGHT HAD ACTUAL NOTICE
        AND FAILED TO PROVIDE ADEQUATE WARNINGS TO THE LEARNED
        INTERMEDIARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

        A.   Defendant had actual knowledge of fractures and should have
             known that fractures were likely from their testing for patients weighing
             more than 230 pounds or more active patients . . . . . . . . . . . . . . . . . . . . . . . . .   17

        B.   California does recognize the learned intermediary rule, but Wright
             did not provide adequate warnings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

        C.   Dr. Bozic's extensive experience as an orthopedic surgeon, with a
             background in biomechancial engineering does not make Wright's
             warnings adequate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

        D.   The discussion of risks and benefits of the a total hip arthroplasty
             does not absolve Wright from failing to warn regarding known
             fractures or to provide adequate warnings concerning the use of the
             long neck in heavier individuals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

        E.   If Wright had warned Dr. Bozic of weight limitations or the fracture
             of the device, Dr. Bozic would not have selected the Profemur
             Device with a long neck . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

IX.     MRS. TUCKER'S LOSS OF CONSORTIUM CLAIM IS A
        DERIVATIVE OF MR. TUCKER'S ACTIONS AND IS A SEPARATE
        MARITAL INTEREST THAT DOES NOT REQUIRE AN EXPERT'S
        TESTIMONY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

X.      CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

CASSEL MALM FAGUNDES
6 S. El Dorado St., Suite 315
Stockton, CA  95202
(209) 870-7900

# TABLE OF AUTHORITIES

**Case Authority:**

*Anderson v. Liberty Lobby*,
   477, U.S. 242, 255 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Anderson v. Owens-Corning Fiberglas Corp.*,
   53 Cal. 3d 987, 1000 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Barker v. Lull Engineering Co.*,
   20 Cal.3d 413, 435 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Brown v. Superior Court*,
   (44 Cal.3d 1049 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Carlin v. Sup. Ct.*,
   13 Cal. 4th 1104, 1112 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Cavers v. Cushman Motor Sales*,
   95 Cal. App. 3d 338, 344-45 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Daubert v. Merrell Dow Pharm.*,
   509 U.S. 579, 589 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Fender v. Medtronic*,
   887 F. Supp. 1326, 1333 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Greenman v. Yuba Power Products*,
   59 Cal. 2d 57 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Hufft v. Horowitz*,
   4 Cal. App. 4th 8 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-17

*Huntsman v. Danek Medical*,
   1998 U.S. Dist. LEXIS 13431 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Mealy v. B-Mobile*,
   195 Cal. App. 4th 1218, 1224. (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Mims v. Wright Medical Technology*,
   Case No. 1:11-CV-213-TWT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Rodriquez v. Bethlehem Steel Corp.*,
   12 Cal. 3d. 382 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Rosburg v. Minnesota Mining & Manufacturing Co.*,
   181 Cal. App. 3d 726, 732 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 14-16

*Soule v. General Motors*,
   8 Cal. 4th 548, 570 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

CASSEL MALM FAGUNDES
6 S. El Dorado St., Suite 315
Stockton, CA 95202
(209) 870-7900

*Wollman v. Wright Medical Technology,*
    Case No. 1:10-CV–3104-DME-BNB . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Statutory Authority:**

Code of Federal Regulations Title 21 section 807.97 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Federal Rule of Civil Procedure, Rule 37(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Federal Rules of Civil Procedure, Rule 56 (c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Federal Rules of Civil Procedure, Rule 26(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Federal Rules of Evidence, Rule 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5


**Secondary Authority:**

6 B.E. Witkin, *Summary of California Law* § 1244
    (9th ed. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

CASSEL MALM FAGUNDES
6 S. El Dorado St., Suite 315
Stockton, CA  95202
(209) 870-7900

## I.     INTRODUCTION

This is a products liability action brought by the Plaintiffs Gregory K. Tucker and Rebecca Tucker against the defendant manufacturer, Wright Medical Technology ("Wright"). Mr. Tucker was diagnosed with ostenecrosis and had a total hip arthroplasty performed on his right hip in 2006. On May 7, 2010, Mr. Tucker was walking outside of his home when his right leg suddenly collapsed. The implant had fractured in the modular neck. That implant was designed and manufactured by Wright.

Wright knew the long neck they produced was being used in heavier more active individuals. Their marketing was targeted towards younger individuals and was advertised as a way to get back to an active lifestyle. Wright also touted that they had over 50,000 units sold with no fractures, until 2005 when they received reports of the first fracture. However, Wright knew of at least 12 neck breakages by 2006, and that there were at least five that involved "fretting" and "micro-movements" similar to those suffered by Mr. Tucker.

Wright's own documentation also shows that their testing was inadequate to determine the performance of the device in higher demand patients. Yet, despite the knowledge of fractures and the inadequate testing, Wright provided no warnings that would help reduce the risk of the fracture of their defective long neck. Wright provided no notice to surgeons, like Dr. Bozic, that they had fractures associated with higher demand patients and that Wright's testing did not evaluate the use of their long neck in higher demand patients.

As the designer and manufacturer of the hip prothesis system, it was their responsibility to take the known risks of their device and to design out the flaws and mechanisms of failure. If the flaw could not be corrected then a sufficient warning had to be provided to limit the use in those groups that had an increased risk of failure. Wright failed to do this with their long necks, even though Wright and the industry knew of safer alternatives, such as using surface treatments on the titanium alloy necks, or switching to cobalt chromium, or changing the taper fit, or even strengthening their warnings. All this was available at a minimal cost to Wright and its bottom line.

Wright dismissed these alternatives and instead was faced with an increasing fracture rate of

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON ALL CAUSES OF ACTION                                1                                00099996.WPD

their long necks. Instead of acting like a responsible, reasonable manufacturer like Aesculap AG, which would pulled their titanium alloy neck after only 3 fractures, Wright waited to investigate until there were 30 fractures. By March 2012, the U.S. long neck fracture rate was 0.93% and by the end of this year it expected to be 1.27%. This is an unacceptable failure rate for the industry and is indicative of a defective device.

Wright is responsible for the defective design of their titanium alloy long neck. It is this defective device that failed in Mr. Tucker and has dramatically affected his life, his wife, and his career. Through the relevant facts of this case, and the opinion testimony of the experts it is clear that a genuine issue of fact exists within the plaintiffs' causes of action for strict liability, negligence and loss of consortium. A reasonable jury could and should find for the Plaintiffs, which means that the defendant's motion should be denied.

## II.    STATEMENT OF FACTS

### A.    Mr. Tucker's Medical History

Plaintiff Gregory K. Tucker, was diagnosed with alcohol-induced osteonecrosis in 2003. (Sep. Stmt. Fact No. 3.) Mr. Tucker has a history of alcohol use as noted in his medical records. (Gray Decl. ¶27, Ex. T: UCSF Med. Records.) In November 2003, he had left hip heimresurfacing procedure performed by Dr. Kevin J. Bozic. (*Id.*) In March 2006, Mr. Tucker underwent a total hip arthroplasty on his right hip. (*Id.*) Dr. Bozic performed the surgery and implanted a Profemur Hip Prosthesis that consisted of a cup, head, long neck, and stem. (*Id.*) The surgery was successful. (*Id.*) Mr. Tucker followed Dr. Bozic's post rehabilitations procedures and orders. (Gray Decl. ¶12, 27, Ex. E: Bozic Rebuttal, Ex. T; Bozic Decl. ¶8.) In April 2007, Mr. Tucker underwent a total hip arthroplasty on his left hip. The operation was performed by Dr. Bozic and no complications were reported.

Mr. Tucker had no complications or discomfort associated with the hip implant between March 2006 and May 2010. (Bozic Decl. ¶8.) On May 7, 2010, Mr. Tucker was walking to his home when the implant suddenly and catastrophically failed. (Gray Decl. ¶11, 27, Ex. D: Bozic Report, Ex. T; Sep. Stmt Fact No. 1.) Mr. Tucker collapsed unable to use his right leg. Mrs. Tucker was present

CASSEL MALM FAGUNDES
6 S. El Dorado St., Suite 315
Stockton, CA  95202
(209) 870-7900

and witnessed the event.  (Gray Decl. ¶23, Ex. P: Mrs. Tucker's Response to Special Int.)  The revision surgery was performed by Dr. Bozic on May 17, 2010. (Gray Decl. ¶27, Ex. T; Sep. Stmt. Fact No. 2.) During the surgery, Dr. Bozic was able to confirm that the device had a fractured long neck near the neck-stem junction. (Gray Decl. ¶11, Ex. D: Bozic Report.) This fracture was similar to research performed by Dr. Bozic regarding fractures in Profemur long necks. (*Id.*) There was no evidence of dislocation or mechanical loosening. (Gray Decl. ¶12, 27, Ex. E: Bozic Report, Ex. T.) An extra 90 minutes was spent during the operation to remove the stem from the femur because of the bone growth and attachment to the stem of the implant. (*Id.*)

B.      The Profemur Hip System

The Profemur Hip System was cleared for market through the 510(k) process. (Gray Decl. ¶36, Ex. CC: FDA Letter; Truman Decl. ¶55.) The 510(k) process allows manufacturers to skip the premarket approval process, by showing their device is substantially similar to a device that was on the market before creation of the Medical Device Act. (*Id.*) The FDA's finding of substantial equivalence does not denote official approval of the device. (21 C.F.R. § 807.97.) Any representation that it does is misleading and constitutes misbranding. (*Id.*)

Wright's testing was inadequate for U.S. population that is heavier and more obese than Europe, Asia or other parts of the world. (Gray Decl. ¶28, Ex. U: McDaniel Dep. 44:5-11; Truman Decl. ¶56.) There are two testing standards used by the industry, ASTM standards or ISO standards. (Gray Decl. ¶9, Ex B: Truman Report at 12.) The FDA guidance documents called for a minimum 5 million cycles of physiological loading under ISO 7206, which calls for a peak load of 517 lb (2300 N). (*Id.*) However, this is too low to assure performance in more active and/or heavier patient populations. ASTM specification 2068-03 and F2068-09 recommends survival of 10 million cycles at 1200 lb (5340 N) in performance testing. (*Id.*) The results of Wright's testing were not sufficient to evaluate the efficacy of the design for use in high demand patients (heavier and/or more active). (Gray Decl. Ex. B: Truman Report at 14.) Wright tests only approximated the walking load of person weighing 160 lbs or 172lbs. (*Id.*) This is insufficient to characterize the performance or fretting issues in higher demand patients. (*Id.*)

At the time of Wright receiving its clearance the risks associated with a modular design were known. (Gray Decl. Ex. B: Truman Report, Ex. D: Bozic Report, Ex. F-G: Hendrickson Reports, Ex. J: James Report, Ex. M: Ochoa Report; Bozic Decl. ¶12.) A modular design introduced the necessary conditions for fretting, corrosion and fatigue to occur. (*Id.*) It was known that heavier individuals and more active individuals increased loads on the prosthesis. Wright's long neck was 25% longer than the normal sized neck, and would be expected to have stress at least 25% greater placed upon it. (Gray Decl. ¶11, Ex. D: Bozic Report; Bozic Decl. ¶12.) Wright's testing showed that higher demand patients had a significantly increased risk of fracture.

The designer and manufacturer of a medical device have the responsibility to produce a product safe for the end use consumer. (Gray Decl. ¶9, 11, 13-14; Bozic Decl. ¶12.) If a mechanism for failure is known to occur within a population of the target market, the designer should make adjustments to the design to correct the flaw. (*Id.*) If the flaw cannot be corrected through the design process, adequate warnings must be included to the limit the use of the product. (*Id.*) This is an ethical obligation of the manufacturer and designer. (*Id.*)

Wright knew of at least 12 breakages of the modular neck. (Gray Decl. ¶25, Ex. R: Wright Modular Neck Reports.) They knew of 7 breakages before 2001 and another 5 breakages between 2001 and 2006. (*Id.*) At least 5 breakages involved issues of micro-movements and fretting, with 4 of these involving heavier patients (279 lb - 297lb). (*Id.*) All the failures occurred in the long neck. (*Id.*) The issues identified were weight and a high level of activity. (*Id.*) Wright took no action to investigate or instigate a CAPA action. (*Id.*)

The instructions for use (IFU) in place at the time of Mr. Tucker's surgery did not contraindicate use in Mr. Tucker. (Gray Decl. ¶31, Ex. X: IFU.) The IFU contraindicates use for "obesity when obesity is defined as three times normal body weight." (*Id.*) The IFU does not reference Body Mass Index ("BMI") to determine the obesity of a patient. (*Id.*) The IFU contains no warnings regarding the increased risk of fracture when using the modular long neck. (*Id.*)

III.   **STANDARD OF REVIEW**

Summary Judgment is only appropriate when the pleadings, depositions, declarations, and

1   evidence as a whole show that no genuine issue of material fact exists and that the movant is entitled

2   to judgment as a matter of law. (Fed. R. Civ. Proc. 56 (c).) The evidence of the nonmovant is to be

3   believed, and all interferences are to be drawn in his favor. (*Anderson v. Liberty Lobby*, 477, U.S.

4   242, 255 (1986).) The court is determining whether the evidence presents sufficient disagreement to

5   require submission to a jury or if the evidence is so-one sided that one party must prevail as a mater

6   of law. (Id. at 251-52.) Essentially, the court is determining whether a reasonable jury could side

7   with the nonmovant (Id. at 252.) Thus, if a genuine issue of fact exists, summary judgment must be

8   denied. (Fed. R. Civ. Proc. 56.)

9   **IV.    PLAINTIFF'S EXPERT TESTIMONY IS ADMISSIBLE AND THE DECLARATION**
10   **OF DEBBY DAURER SHOULD BE EXCLUDED**

11   First, the plaintiff's expert testimony is admissible. As shown in plaintiff's concurrently filed

12   oppositions to exclude testimony, under FRE 702 and *Daubert* plaintiffs' expert's opinions are based

13   on reliable methodologies, supported by the facts and science and will assist the trier of fact.

14   (*Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589 (1993).)

15   Second, the plaintiff's object to the declaration of Debby Daurer. Under the Federal Rules of

16   Civil Procedure, Rule 26(a)(1), the parties are required to identify individuals likely to have

17   discoverable information that the party may use to support its claims or defenses. Wright did not

18   identify Ms. Daurer in their initial disclosures, nor have they amended these disclosures. (Gray Decl.

19   ¶30, Ex. W: Defendant's Initial Disclosures.) Additionally, Wright was served with a deposition

20   notice regarding the person or persons most knowledgeable about the modular necks, which included

21   the history of the neck. Mrs. Daurer was never identified by Wright or its counsel. Wright is now

22   attempting to use Ms. Daurer to provide testimony regarding the history of the Profemur system,

23   including the FDA clearance, changes to the devices design, the total amount of systems sold, the

24   fracture rate of the necks, availability of the hip system, the CAPA testing, and Safety Alert letters

25   that went out. This surprise tactic comes at great harm to plaintiffs, since fact discovery has been

26   closed and only now is Wright identifying Ms. Daurer. Under Federal Rule of Civil Procedure

27   37(c)(1) a party that fails to disclose information under Rule 26(a) is not permitted to use such

28

CASSEL MALM FAGUNDES
6 S. El Dorado St., Suite 315
Stockton, CA  95202
(209) 870-7900

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON ALL CAUSES OF
ACTION                                               5                                        00099996.WPD

1    evidence at a trial, hearing or motion. Therefore, Ms. Daurer's declaration should be unavailable to

2    support their motion for summary judgment.

3    **V.    PLAINTIFF'S NEGLIGENT DESIGN CLAIM IS VIABLE AS PLAINTIFFS HAVE
            SHOWN THAT DESIGN PROXIMATELY CAUSED MR. TUCKER'S INJURY AND
4           THE RISKS FAR OUTWEIGH THE BENEFITS**

5           In California, a design defect is determined by the application of two alternative tests: (1) the

6    consumer expectation test, or (2) the risk benefit analysis. (*Rosburg v. Minnesota Mining &*

7    *Manufacturing Co.*, 181 Cal. App. 3d 726, 732 (1986) *citing Barker v. Lull Engineering Co.*, 20

8    Cal.3d 413, 435 (1978).) The consumer expectation test evaluates whether the product failed to

9    perform as safely as an ordinary consumer would expect when used in an intended or reasonably

10   foreseeable manner. (*Id.*) The risk/benefit analysis evaluates whether the benefits outweigh the risks

11   and if the design proximately caused the injury. (*Id.*) If the natures of the defect is not within the

12   ordinary consumer's experience and understanding, then the applicable test is the Risk/Benefit

13   analysis. (*Soule v. General Motors*, 8 Cal. 4th 548, 570 (1994).)

14          Under the risk/benefit analysis, the burden is the manufacturer's to prove that the balance of

15   the benefits outweigh the risk of danger is on the manufacturer. (*Rosburg*, 181 Cal. App. 3d at 732.)

16   Expert opinions are used to evaluate the strengths, shortcomings, risks, and benefits of a challenged

17   design. (*Soule*, 8 Cal. 4th at 571.) The jury in weighing the risks and benefits may consider, "among

18   other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that

19   such danger would occur, the mechanical feasability of a safer alternative design, the financial cost

20   of an improved design, and the adverse consequences to the product and to the consumer that would

21   result from an alternative design." (*Barker*, 20 Cal.3d at 431.)

22          Wright asserts only two benefits for their design, (1) modularity and (2) biocompability and

23   corrosion resistance of titanium alloy, while glossing over the risks. However, the increased risks of

24   fracture in higher demand patients, given the knowledge of Wright and availability of safer

25   alternatives, shows that the risk outweigh the benefits. (Gray Decl. ¶9-14, 25, Ex. B: Truman Report,

26   Ex. C: Truman Rebuttal, Ex. D: Bozic Report, Ex. E: Bozic Rebuttal, Ex. F: Hendrickson Report,

27   Ex. G: Hendrickson Rebutal; Bozic Decl. ¶1-16; Truman Decl. ¶70-71.)

28

CASSEL MALM FAGUNDES
6 S. El Dorado St., Suite 315
Stockton, CA 95202
(209) 870-7900

The long neck designed to be manufactured out of titanium alloy was defective because it was not strong enough to withstand foreseeable forces on the device when used within a target group for hip implants. Wright was aware of the susceptibility of the modular design to fretting and fracture. (Gray Decl. ¶25, Ex. R.) Wright was aware that their inadequate testing showed their device could not sustain the forces within higher weight or higher active patients, yet they marketed the device to this group. Wright also failed to consider safer alternatives to corrects a known fatal flaw of their design through the use of surface treatments or by switching to a stronger material like Cobalt-Chromium, or by including an adequate warning with a weight cutoff. Plaintiffs' experts have offered reliable opinions regarding these topics as well as the potential costs of the alternatives.

A. **Wright knew or should have known of the risks associated with a modular design and the choice of titanium alloy for the long neck and had actual knowledge of fractures occurring**

The risks and methods of failure in modular implants are well-known. (Gray Decl. ¶ 20, Ex. M: Ochoa Report at 16.) This includes issues with "fretting, corrosion, and fatigue" of the device. (Gray Decl. ¶17, Ex. J: James Report at 5.) Inherent in the modular design are the necessary elements for failure by the process of fretting. (Gray Decl. ¶13-14, Ex. F: Hendrickson Rep. at 7, Ex. G: Hendrickson Rebuttal 1-3; Hendrickson Decl. ¶9.) Fretting results from the very slight oscillatory motion between two surfaces pressed in contact, without this junction there can be no fretting. (Gray Decl. ¶13-14, 17, Ex. F at 7, Ex. G: at 1, 3, Ex. J: James Report at 5.) Orthopedic surgeons, such as Dr. Bozic, expect that Wright is aware of the medical literature regarding these issues and that Wright will account for these issues in their design and manufacturing of the hip. (Bozic Decl. ¶12.)

Wright Medical admits that it had notice of two fractures before Mr. Tucker's surgery in 2006. However, documents produced by Wright show they knew of 12 neck breakages before 2006. (Gray Decl. ¶25, Ex. R.) In 2001, they knew of seven neck breakages. (*Id.*) In at least two of those matters there was evidence of micro-movements and fretting and concerns regarding weight appeared as one of the patient was 130 kg [286.6 lbs.] and the fracture occurred without accident. (*Id.*) From 2001 to 2006, Wright recorded 5 additional breakages. (*Id.*) Of those, 3 involved micro-movements between neck and stem as the cause of failure, and the patients weighed between 279 lbs

and 297lbs. (*Id.*) All three breakages occurred in long necks. (*Id.*) The report cites patient weight and high level of activity as concerns. (*Id.*)

**B.     Wright's testing was inadequate for the U.S. population**

At the time of hip implant was designed, built and introduced to the United States, it was generally accepted that the loads in the femur during common activities like walking, climbing stairs or getting in and out of chairs would produce loads 1 to 5 times body weight. (Gray Decl. ¶9, Ex. B: Truman Rep. at 12.) Something more strenuous like fast walking or running can result in forces from 4 to 8 times body weight and something as simple as stumbling can result in forces 8 times body weight. (*Id.*)

It has also been generally accepted that the U.S. population is generally heavier and more obese than Europe, Asia or other parts of the world (Gray Decl. ¶28, Ex. U: McDaniel Dep. 44:5-11.)

The testing process includes testing standards that are referred to ASTM standards or ISO standards. (Gray Decl. ¶9, Ex. B: Truman Rep. at 12.) The FDA guidance documents called for a minimum 5 million cycles of physicalogic loading under ISO 7206, which calls for a peak load of 517 lb (2300 N). (Gray Decl. ¶9, Ex. B at 12.) However, this is too low to assure performance in more active and/or heavier patient populations. ASTM specification 2068-03 and F2068-09 recommends survival of 10 million cycles at 1200 lb (5340 N) in performance testing. (*Id.*) There was no reason that the higher cycles endurance limit of 5340N (1200lb), or greater, could not have been required of this design in the ISO7206-6:1992 tests prior to Mr. Tucker receiving his implant. (Gray Decl. ¶9, Ex. B at 12-13, 25-28; Truman Decl. ¶63.)

Essentially the testing performed by Wright was not sufficient to evaluate the efficacy of the design for use in high demand patients (heavier and/or more active). (Gray Decl. ¶9, Ex. B: Truman Rep. at 14.) The Wright tests only approximated the walking load of person weighing 160 lbs or 172lbs. (*Id.*) So, even though the current ISO and ASTM test performance standards were initially developed for average size and moderate activity patients, they are insufficient for devices intended to be used in heavier individuals. (Gray Decl. ¶9, Ex. B at 12-13, 25-28; Truman Decl. ¶67.) This was insufficient to characterize the performance or fretting issues in higher demand patients. (Gray

CASSEL MALM FAGUNDES
6 S. El Dorado St., Suite 315
Stockton, CA  95202
(209) 870-7900

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON ALL CAUSES OF
ACTION                                                                8                                              00099996.WPD

1    Decl. ¶9, Ex. B at 14.) Wright knew the device had not been tested to assure endurance when used in

2    higher demand patients and they knew the device did not meet the recommended strength

3    recommendations of ASTM F 2068-03. (*Id.*; Truman Decl. ¶67.)

4         In 2010, Wright's testing confirmed that titanium alloy long neck did not meet the ASTM

5    Standard load (5340 N), while the CoCr alloy long neck substantially exceeded the testing standards.

6    This testing and analysis was available to Wright prior to the 2003 launch of their titanium alloy

7    necks. (Truman Decl. ¶69.)

8         **C.    Mr. Tucker was a targeted and foreseeable consumer within the normal
              distribution of the U.S. population and Wright actively marketed the device to
9             younger high demand individuals**

10        Despite knowing the limitations of their titanium alloy long neck. Wright marketed the

11   superior strength of the ProFemur hip. (Gray Decl. ¶9, Ex. B: Truman Rep. at 16.) The brochures do

12   not point out that the life of the product would be less in heavier, more active individuals or

13   individuals doing more strenuous activities such as lifting, stooping, climbing stairs or participating

14   in sports. (*Id.*) Instead the Wright device was marketed to younger, active individuals as a way to

15   restore an active lifestyle. Wright's website is full of patient testimonials describing things such as

16   martial arts, wrestling, running, motor biking, cycling, and other high demand situations. (Gray Decl.

17   ¶9, 35, Ex B at 16-17, Ex. BB: Wright Patient Testimonials.)

18        Mr. Tucker at the time of implantation was 6'3" and 257 lbs. (Gray Decl. ¶27, Ex. T: UCSF

19   Med. Records.) Mr. Tucker's weight is within the normal distribution of the U.S. Population. (Gray

20   Decl. ¶9, Ex. B: Truman Rep. at 30, 41-42; Truman Decl. ¶20.) Mr. Tucker was 42 at the time of his

21   surgery and is considered to be an active individual. (Gray Decl. ¶9, 27, Ex. B, Ex. T.) Wright

22   Medical marketed their products to younger active individuals. A significant group of their target

23   market included individuals who weighed more than 230 pounds.

24        **D.    Safer alternatives were available to Wright such as surface treatments, use of a
              stronger material, a geometry change to the taper, or the use of better warnings
25            and these alternatives were available when Wright began marketing their device
              in the U.S. and at a minimal cost**
26

27        There were safer alternatives for Wright to use at the time the device was designed and

28

CASSEL MALM FAGUNDES
6 S. El Dorado St., Suite 315
Stockton, CA  95202
(209) 870-7900

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON ALL CAUSES OF
ACTION                                          9                                        00099996.WPD

1   seeking clearance to the United States. The safer alternatives included using surface treatments,

2   using Coblalt Chomium (CoCr), alternating the taper fit, or providing adequate warnings. Any

3   alternative by itself or in combination with others could have been used to achieve suitable strength

4   and endurance for use in higher demand individuals like Mr. Tucker. (Gray Decl. ¶9, Ex B: Truman

5   Rep. at 30-31.)

6        First, Wright could have used surface treatments to the titanium alloy modular neck to

7   increase its strength and resistance to fretting. In 1999-2004 there were several different methods

8   known to the industry to improve the fatigue strength and inhibit crack formation and crack

9   propagation. (Gray Decl. ¶9, Ex B: Truman Rep. at 33.) This include roller burnishing (LPB), laser

10  peening, or laser shock peening (LSP.) (*Id.*) Roller burnishing was used by BioMet and Exactech.

11  (*Id.*) Essentially these treatments compress the surface of the treated component, which reduces the

12  likelihood of cracks forming, which reduces the incidence of fretting and surface defects. (*Id.*) Other

13  hardening and surface enhancement technologies such as anodizing or titanium nitrating were also

14  options available to Wright. The estimated cost for processing a modular neck hip implant would be

15  approximately $50 to $130. (*Id.*)

16       A second option was to switch to a stronger material such as CoCr. The Titanium Alloy

17  (Ti6Al4V) used by Wright is approximately ½ as stiff as those found in CoCr alloys. (Gray Decl. ¶9,

18  Ex B: Truman Rep. at 31.) Both titanium and CoCr are stiffer than cortical bone and both have a

19  long history of successful use in both cemented and cementless total hip arthroplasty stems. (*Id.*) If

20  fracture and wear are of primary concern, Cobalt based alloys are a better choice than titanium alloys

21  (Gray Decl. ¶17, Ex. J: James Rep. at 11.)

22       Defendant cites concerns about switching to CoCr because the titanium alloy is more

23  biocompatible with bone. (Gray Decl. ¶17, Ex. J: James Rep. at 11.) However, this concern can

24  easily be alleviated because of the modular nature of the device. The only change that needs to be

25  made is the modular neck. (Gray Decl. ¶9, Ex. B: Truman Rep. at 32.) This would not significantly

26  alter the femoral stem-bone interfaces stresses because the bone interface material can still be

27  titanium alloy. (*Id.*) This coupling of different materials has been successful in the U.S. for

28

1   approximately 25 years, as a majority of total hip modular heads are made from CoCr and have been

2   mated with stems made of the titanium alloy. (*Id.*)

3       The cost to manufacturer CoCr necks is slightly higher than that of a Titanium (Ti6Al4V)

4   alloy neck, however the difference in costs depending on the processes and supplier, is only about

5   $10 to $50. (Gray Decl. ¶9, Ex. B: Truman Rep. at 31.) This cost is small in comparison to the price

6   charged for the implant. This would have allowed Wright to produce a stronger modular neck, keep a

7   competitive price, and still reap a profit. (*Id.*)

8       The third alternative available to Wright was to adjust the taper fit of the neck and stem.(Gray

9   Decl. ¶9, Ex. B: Truman Rep. at 22.) It is not feasible to produce mating tapered with identical

10  tapers, in other words a perfect fit. (*Id.*) A change in the taper angle in the female pocket so that it is

11  smaller than the allowed taper angle of the male neck, would create a contact at the opening of the

12  pocket. This has two potential benefits: (1) creates a seal at the surface to prevent fluids from

13  entering and minimize crevice corrosion, and (2) reduces point contact loading at the opening due to

14  bending of the head relative to the stiffer stem. (*Id.*) The tighter fit would lead to less motion at the

15  junction and reduce fretting. (*Id.*)

16      A fourth safer alternative for Wright would have been to use a warning with specific

17  limitations, such as Exactech's AcuMatch M modular femoral stem. The AcuMatch is a titanium

18  alloy design that is stronger than Wright's ProFemur, but it provides a specific contraindication for

19  moderately active to vigorously active patients weighing greater than 250 lb. (Gray Decl. ¶9, Ex. B:

20  Truman Rep. at 33-34.) Exactech included this limitation despite test results showing the device was

21  strong enough to use in minimally active patients weight up to 360 lb. (Gray Decl. ¶9, Ex. B: Truman

22  Rep. at 45.) The cost difference of a specific warning would be negligible.

23      The plaintiffs' experts have provided several different safer alternatives that were available to

24  Wright when introducing the ProFemur long neck to the United States. These options were at a

25  minimal of costs and could have been used by themselves or in combination with each other to

26  substantially reduce the issues of fretting in the long neck when used in higher demand patients

27  within the U.S. population. Additionally, in 2010 Wright switched to a CoCr long neck and now

28

1  includes an instruction for use that contraindicates the use above 230 lbs.

2  **E.    Wright Medical's long neck fracture rate does not compare favorably to those
       rates reported in the literature**

3

4  Wright's long neck fracture rate has steadily been rising. As of November 18, 2010, Wright

5  calculated their North America long neck fracture rate to be 0.546% or 1 in 183 long necks. (Gray

6  Decl. ¶9, Ex. B: Truman Rep. at 36-41; Truman Decl. ¶23.) Wright predicted that the neck fractures

7  would continue at a rate of 6.5 new fractures per month. (Truman Decl. ¶25.) The monthly fracture

8  rate was closer to 8.7 fractures per month. (Truman Decl. ¶27.) As of December 31, 2011, the U.S.

9  long neck fracture rate was 0.883% or 1 in 113. (Gray Decl. ¶26, Ex. S: Debby Daurer Email.) By

10 March 31, 2012, the fracture rate was 0.93%. (Gray Decl. ¶17, 20, Ex. J: James Rep. at 13, Ex. M:

11 Ochoa Rep. at 26.) If the trends continue by the end of 2012 there should be a total 192 U.S. long

12 neck fractures for a fracture rate of 1.27% (192 fractures out of 15,060 sales). (Truman Decl. ¶30.) It

13 is the fracture rate for the life of the product that is material to whether the product is successful.

14 (Truman Decl. ¶31.)

15 Wright asserts as an undisputed fact that their fracture rate is similar to, if not better than,

16 others in the industry. (Doc No. 71, Defendant's Fact No. 23.) However, this misrepresents the data

17 presented by their experts. Of the nine failure rates provided by Wright's expert only one is

18 comparable to our situation. (Gray Decl. ¶9, Ex. B: Truman Rep. at 36-41; Truman Decl. ¶35-53.)

19 The problem with the rates stated in the literature is that rates are based on the reported fractures out

20 of a population of revision surgeries performed. Essentially, the rates are limited to only the failed

21 implants that needed revision surgery. Whereas, Wright's fracture rate is the number of fractures

22 divided by the total number of sales. We would need to know the total number of sales for each of

23 the cited hip prosthesis systems or we would need to know the total number of revision surgeries

24 involving the Profemur Hip Prosthesis and the long neck. (Gray Decl. ¶9, Ex. B at 36; Truman Decl.

25 ¶35-53.)

26 Since we do not have total sales of the devices studied in literature, we can get a rough

27 estimate of Wright's failures by reviewing the FDA's MAUDE database, which contains reported

28

CASSEL MALM FAGUNDES
6 S. El Dorado St., Suite 315
Stockton, CA 95202
(209) 870-7900

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON ALL CAUSES OF
ACTION                                    12                                    00099996.WPD

1  failures of medical devices. (Gray Decl. ¶34. Ex AA: MAUDE Events Report.) A search of the

2  database between January 1, 2000 and December 15, 2012 turns up 1256 reported events regarding

3  Profemur products. (*Id.*) Using Wright's numbers from the end of 2011, there were 149 total U.S.

4  neck fractures. (Gray Decl. ¶26, Ex. S: Daurer Email.) This would translate into a 11.86% fracture

5  rate (149 fractures out of 1256 reported failures). Of the articles cited by Defendant's experts, Wright

6  would have the distinction as the highest fracture/failure rate of the group. (Gray Decl. ¶17, 20, Ex.

7  J: James Rep. at 12, Ex. M: Ochoa Rep. at 27; Truman Decl. ¶35-36.)

8      The one case that is comparable without additional information is discussed in the Grupp

9  Article. (Gray Decl. ¶9, Ex. B: Truman Rep. at 36-41; Truman Decl. ¶38-42.) Aseculap AG,

10  manufactured the Metha Short Hip System Prostheses, which was a modular hip system that used a

11  titanium alloy (Ti6Al4V) neck and stem. (*Id.*) There were 5,000 of these systems that were implanted

12  between August 2004 and November 2006. (*Id.*) The modular necks fractured on average at 24

13  months (0.7 - 4.0 years) after implantation. (*Id.*) The manufacturer removed the product from the

14  market after only three fractures. The failure rate at the time of removal was only 0.06%. (*Id.*) The

15  manufacturer also published the results of their failure analyses at least three times in peer reviewed

16  literature to benefit the general orthopaedic community. (*Id.*) In the end, there were 68 fractures of

17  the neck for a failure rate of 1.4%. (*Id.*)

18      In contrast, Wright Medical admits that it had notice of two fractures before Mr. Tucker's

19  surgery in 2006. Additionally, documents produced by Wright show they knew of at least 12 neck

20  breakages by 2006, with at least 5 being the result of fretting in long necks in patients where weight

21  was an issue. (Gray Decl. ¶25, Ex. R.) Additionally, it does not appear from the IFU that the use in

22  those patients was contraindicated. (Gray Decl. ¶31, Ex. X.) *

23  **F.**   **Wright's reliance on a similar case is misleading and California law was not**
         **applied in Cappellano v. WMT**

24

25      The Cappellano case does involve a heavier individual with a fracture in a titanium alloy

26  neck, however, it does not apply California law or use the same experts as our case. There are more

27  recent decisions that would be applicable, such as *Mims v. Wright Medical Technology*, Case No.

28

CASSEL MALM FAGUNDES
6 S. El Dorado St., Suite 315
Stockton, CA 95202
(209) 870-7900

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON ALL CAUSES OF
ACTION                                                       13                                                       00099996.WPD

1   1:11-CV-213-TWT, and  *Wollman v. Wright Medical Technology*, Case No. 1:10-CV–3104-DME-

2   BNB.

3       The court in *Mims* issued their order on Wright's motion for summary judgment in May

4   2012, and the *Wollam* court issued their order on Wright's summary judgment motion in September

5   2012. Both cases involved a fracture of the Profemur long neck in heavier individuals. (*Mims* Doc.

6   No. 106; *Wollam* Doc 175.) Both cases involved the expert Mari Truman, P.E. and both courts

7   performed a risk/benefit analysis. Both courts found that a genuine issue of material fact existed

8   regarding the risks and benefits and found that a reasonable jury could side with the plaintiffs. (*Mims*

9   Doc 106; *Wollam* Doc 175.)

10          **G.    The defective design of the ProFemur long neck is the proximate cause of the**
            **fracture and injury to Mr. Tucker**
11

12      The injury to Mr. Tucker's right leg and the current functional changes or disabilities are the

13   results of the failure of the femoral implant which was defectively designed. (Gray Decl. ¶9, Ex. B:

14   Truman Rep. at 46.) Mr. Tucker's treating physician believes that as a result of his injury Mr. Tucker

15   will have a 20-25% reduction in the quality of life compared to patients with a primary hip

16   replacement. (Gray Decl. ¶11, Ex. D: Bozic Report.)

17      As outlined above, the risks in using the titanium alloy for long necks outweighed the

18   benefits touted by Wright, especially in light of the viable safer alternatives that were not cost

19   prohibitive.

20   **VI.   PLAINTIFFS STRICT LIABILITY DESIGN DEFECT CLAIM IS VIABLE FOR**
            **REASONS PREVIOUSLY DISCUSSED**
21

22      A manufacturer is strictly liable in tort when the manufacturer places an article on the market,

23   knowing that it is to be used without inspection for defects, that proves to have a defect that causes

24   injury. (*Greenman v. Yuba Power Products*, 59 Cal. 2d 57 (1963).) A product may be defective

25   because of a manufacturing defect, design defect or warning defect. (*Rosburg v. Minnesota Mining &*

26   *Mfg. Co.*, 181 Cal. App. 3d 726 (1986).) A design defect in strict liability still requires the benefits of

27   the challenged design to outweigh the risk of danger inherent in the design. (*Id.*)

28      In *Brown v. Superior Court*, the court applied strict liability to the case of prescription drugs.

CASSEL MALM FAGUNDES
6 S. El Dorado St., Suite 315
Stockton, CA  95202
(209) 870-7900

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON ALL CAUSES OF
ACTION                                          14                                          00099996.WPD

1  (44 Cal.3d 1049 (1988).) The court held that a "manufacturer is not liable for injuries caused by a

2  prescription drug so long as the drug was properly prepared and accompanied by warnings of its

3  dangerous propensities that were either known or reasonably scientifically knowable at the time of

4  distribution." (*Id.* at 1069.) This rationale was extended to medical devices by *Hufft v. Horowitz*, 4

5  Cal. App. 4th 8 (1992). *Hufft* held that a manufacturer was not strictly liable for injuries caused by an

6  implanted prescription medical product which has been (1) properly made and (2) distributed with

7  information regarding risks and dangers of which the manufacturer knew or should have known at

8  the time.

9       As discussed, the risks involved with Wright's design outweighed the benefits and there were

10  safer alternatives available for Wright's consideration at the time the device was seeking clearance in

11  the United States. The record shows that Wright knew of at least 12 neck breakages before 2006.

12  Wright's testing showed that the device could not withstand forces of a higher demand patient, yet

13  Wright targeted higher demand patients with their advertising, while touting no fractures.

14  Additionally, as discussed below, a manufacturing defect cannot be ruled out. So under the rationale

15  of *Hufft*, Wright will not be able to show that it met the prerequisites to be exempt from strict

16  liability. As such, the defendant's motion should be denied.

17  **VII.  PLAINTIFF'S MANUFACTURING DEFECT CLAIMS UNDER STRICT LIABILITY
18      AND NEGLIGENCE ARE SUPPORTED BY THE FACTS IN THE RECORD AND A
        GENUINE ISSUE OF FACT EXISTS BETWEEN THE METALLURGISTS**

19       A manufacturing defect exists when the product differs from the intended result. (*Rosburg*,

20  181 Cal. App. 3d at 732.) Under California law, the requirements for strict liability and negligence

21  are the same. (*Fender v. Medtronic*, 887 F. Supp. 1326, 1333 (1995).) To establish a claim, there

22  must be an injury by the product that was caused by reason of it being defective, and that the defect

23  existed when the products left the hands of the defendant. (*Id. quoting* 6 B.E. Witkin, *Summary of*

24  *California Law* § 1244 (9th ed. 1988).)

25       In our case, the fracture of the long neck was determined to be fretting, corrosion and metal

26  fatigue (Gray Decl. Ex. B: Truman Rep. at 18-21; Ex. D: Bozic Rep., Ex. F: Hendrickson Rep. at 7,

27  Ex. J: James Rep. at 4, Ex. M: Ochoa Rep. at 9.) There, however, is a dispute between the two

28

CASSEL MALM FAGUNDES
6 S. El Dorado St., Suite 315
Stockton, CA  95202
(209) 570-7900

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON ALL CAUSES OF
ACTION                                           15                                    00099996.WPD

1   metallurgist on the existence of a manufacturing defect. A manufacturing defect is device specific

2   and reliance on device history records alone will not suffice to state with any degree of certainty a

3   dimensional or surface manufacturing defect was the cause or contributing cause. (Gray Decl. ¶13-

4   14, Ex. F-G: Hendrickson Reports; Hendrickson Decl. ¶11-12.)

5          Dr. Hendrickson has completed a thorough examination of the and has concluded that "based

6   on the physical evidence available from the analysis done to date, the fatigue fracture was initiated

7   by fretting, which was a direct result of the design of the device, with errors in manufacturing most

8   likely contributing factors." (Gray Decl. ¶13, Ex. F: Hendrickson Rep. at 7.) Dr. James on the other

9   hand believes no manufacturing defect existed despite stating that given the damage, "no

10  determination of the presence or absence of any surface or dimensional defect could be made." (Gray

11  Decl. ¶17, Ex. J: James Rep. at 5.)

12         The opinions of plaintiff's metallurgist and defendant's metallurgist are in conflict with each

13  other, yet are based on similar reliable methodologies and facts of the case. This is a classic issue of

14  a material dispute existing and an issue that should be presented to the jury to decide the

15  persuasiveness of the evidence.

16  **VIII.  PLAINTIFF'S STRICT LIABILITY AND NEGLIGENT FAILURE TO WARN**
17  **CLAIMS SHOULD DEFEAT SUMMARY JUDGMENT AS THE FACTS SUPPORT**
    **THAT WRIGHT HAD ACTUAL NOTICE AND FAILED TO PROVIDE ADEQUATE**
18  **WARNINGS TO THE LEARNED INTERMEDIARY**

19         A product that is not otherwise defective may be defective if a suitable warning of the

20  product's dangerous propensity is not given. (*Rosburg*, 181 Cal. App. 3d at 732 *citing Cavers v.*

21  *Cushman Motor Sales*, 95 Cal. App. 3d 338, 344-45 (1979).) A manufacturer is liable for failing to

22  warn of a particular risk which fell below the acceptable standard of care, or in other words, what a

23  reasonably prudent manufacturer would have known and warned about. (*Carlin v. Sup. Ct.*, 13 Cal.

24  4th 1104, 1112 (1996).) There is no duty on the manufacturer to warn against unknown or obvious

25  dangers. (*Hufft*, 4 Cal. App. 4th at 13; *Anderson v. Owens-Corning Fiberglas Corp.*, 53 Cal. 3d 987,

26  1000 (1991).) The manufacturer's duty in the case of prescription drugs or medical devices runs to

27  ///

28

CASSEL MALM FAGUNDES
6 S. El Dorado St., Suite 315
Stockton, CA 95202
(209) 870-7900

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON ALL CAUSES OF
ACTION                                                                    16                                        00099996.WPD

1  the physician under the learned intermediary doctrine. (*Huntsman v. Danek Medical*, 1998 U.S. Dist.

2  LEXIS 13431 (1998).)

3      In *Hufft*, the court was presented with a case where a plaintiff was suing a manufacturer over

4  the leakage from breast implants. The warning provided with the implants stated:

5      McGhan Medical Corporation is aware of the potential for leakage in inflatable
       implants over an undefined time period. Considering the chemical and physical
6      properties of the material used in the manufacture of the inflatable implants, deflation
       is not expected. However, long-term results cannot be guaranteed.
7

8  (*Hufft*, 181 Cal. App. 3d at 735.)  The court found that the warning comprised the knowledge

9  available in 1976 and that the physician already knew of the danger of spontaneous deflations.

10     Our case stands in contrast. Wright's warnings did not provide a warning regarding the risk

11  of fracture of their long neck in heavier demand patients. Their warning did not contain the state of

12  available knowledge in 2000 for the industry or for Wright. Competitors, such as Exactech, used

13  warnings that limited the use of the product based on weight to avoid fractures and it provided a

14  cushion of safety to avoid overloading the devices top testing loads. (Gray Decl. ¶9, Ex. B: Truman

15  Rep. at 17.) Additionally, Wright knew of actual in vivo fractures, and the limitations of their testing,

16  yet provided no specific warning, such as *Hufft* did with the leakage issue. Also Dr. Bozic did not

17  have knowledge of the increased risk Wright's long necks would place in higher demand patients.

18  (Bozic Decl. ¶7, 13.)

19      **A.    Defendant had actual knowledge of fractures and should have known that
               fractures were likely from their testing for patients weighing more than 230**
20             **pounds or more active patients**

21      First, Wright admitted knowledge of only 2 fractures. However, Wright's documents show

22  they knew of at least 12 neck breakages by 2006. (Gray Decl. ¶25, Ex. R: Modular Neck Reports.)

23  They had 7 reported neck breakages by 2001 and in at least two of those matters there was evidence

24  of micro-movements and fretting. (*Id.*) There was evidence of weight being an issue, with one of the

25  fractures occurring without an accident in a patient who weighed 286 lbs. (*Id.*) Between 2001 and

26  2006 there 5 more neck breakages reported. (*Id.*) Of those, 3 involved micro movements between

27  neck and stem as the cause of failure, and the patients weighed between 279 lbs and 297lbs. All three

28

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON ALL CAUSES OF
ACTION                                                                    17                                        00099996.WPD

1   breakages occurred in long necks. The report cites patient weight and high level of activity as

2   concerns.

3          Second, this is not a case of an obvious or generally known or recognized danger to the

4   consumer. It is Wright's responsibility as the manufacturer to adequately design their product to

5   account for the known dangers to provide a safe product, or if the flaw cannot be protect sufficiently

6   limit the products use. (Bozic Decl. ¶12; Truman Decl. ¶56-57, 60.) In our case, Wright had actual

7   notice that their Profemur long necks could not withstand forces of higher demand patients, through

8   their testing of the device and through actual in vivo fractures, yet they continued to market and sell

9   the device without providing a warning with a definitive weight and activity restriction like other

10  manufacturers. (Truman Decl. ¶12.)

**B.     California does recognize the learned intermediary rule, but Wright did not
         provide adequate warnings**

13          The learned intermediary rule means that a manufacturer needs to warn the doctor, rather than

14  the patient regarding the risks associated with the use of the product. Wright did not warn Dr. Bozic

15  of the increased risk of fracture of the long neck when used in higher demand patients. (Bozic Decl.

16  ¶13.) At the time of Mr. Tucker's surgery, Wright's documents show that they had reports of at least

17  12 different fractures all the way back to 2001. (Gray Decl. ¶25, Ex. R.) With at least 5 of the

18  fractures being caused by micro-movements and fretting near the neck-stem junction. (*Id.*) These

19  fractures involved the long neck and at least 4 involved heavier weight patients. (*Id.*) Wright did not

20  update their Instructions For Use ("IFU") nor did they inform Dr. Bozic of these known fractures.

21  (Gray Decl. ¶31, Ex. X; Bozic Decl. ¶12.)

22          The IFU relied upon by Wright states "in selecting patients for total join replacements, the

23  following factors can be critical to the eventual success of the procedure." (Gray Decl. ¶31, Ex. X:

24  Wright's IFU.) The IFU lists four factors: (1) Patients Weight, (2) Patient's occupation or activity,

25  (3) Condition of senility, mental illness, or alcoholism, (4) Foreign body sensitivity. (*Id.*) This IFU

26  does not warn of the risk of fracture or the fact that the device could not withstand heavier high

27  demand patients. (*Id.*)

28

CASSEL MALM FAGUNDES
6 S. El Dorado St., Suite 315
Stockton, CA 95202
(209) 870-7900

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON ALL CAUSES OF
ACTION                                                     18                                        00099996.WPD

1    The IFU states "Patient's weight. An overweight or obese patient can produce high loads on

2 the prosthesis which can lead to failure of the prosthesis. This becomes a major consideration when

3 the patient is small boned and a small size prosthesis must be used." (Gray Decl. ¶31, Ex. X:

4 Wright's IFU.) The IFU defines obesity "as three times normal body weight." (*Id.*) Mr. Tucker was

5 not obese under Wright's definition, and it logically follows that under this IFU, he was not

6 overweight. There is no mention of body mass index (BMI), which Wright's experts now uses to

7 define obesity. (*Id.*) This warning provides no direction, useful limitations based on Wright's

8 knowledge from testing, or discusses Wright's knowledge of in vivo fractures in long necks of higher

9 demand patients. (Gray Decl. ¶25, 31, Ex. R, Ex. X.) Without a clear definition, similar to

10 ExacTech's 250 lb limit, defendant's warnings provide no guidance or warning at all.

11    Second, the IFU states "Patients occupation or activity. If the patient is involved in an

12 occupation or activity, which includes substantial walking, running, lifting, or muscle strain, the

13 resultant forces can cause failure of the fixation, the device, or both. The prosthesis will not restore

14 function to the level expected with normal healthy bone, and the patient should not have unrealistic

15 function expectations." (Gray Decl. ¶31, Ex. X: Wright's IFU.) In this statement Wright provides no

16 indications of what they classify as "substantial." (*Id.*) This warning is also undermined and in stark

17 contrast to Wright's marketing of the device. (Truman Decl. ¶12.) Failure included much more than

18 fracture as admitted by defendant's expert Dr. James. (Gray Decl. ¶19, Ex. L: James Dep. 26:11-

19 28:14, 49:14-23, 51:5-52:2.)

20    Wright touts the device as a way to get back to your active lifestyle in brochures and through

21 patient testimonials on the internet. (Gray Decl. ¶9, Ex B: Truman Rep. at 17.) The patient

22 testimonials include young active individuals getting back to golf, wrestling, martial arts, long

23 distance cycling, and dirt bike riding. (Gray Decl. ¶35, Ex. BB: Wright Patient Testimonials.) Mr.

24 Tucker was a younger, moderately active to active individual. (Gray Decl. ¶9, 11, 27, Ex. B: Truman

25 Rep., Ex. D: Bozic Rep., Ex. T: UCSF Med. Records; Truman Decl. ¶20.) His activities daily living

26 routines, such as walking, sitting, standing, climbing stairs and exercising by using a recumbent

27 bicycle and some lifting.

28

CASSEL MALM FAGUNDES
6 S. El Dorado St., Suite 315
Stockton, CA 95202
(209) 870-7900

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON ALL CAUSES OF
ACTION                                    19                                    00099996.WPD

1    The third warning regarding alcoholism is relevant because of Mr. Tucker's history with

2    alcohol. (Gray Decl. ¶10, 12, 27, Ex. C: Truman Rebuttal, Ex. E: Bozic Rebuttal, Ex. T: UCSF Med.

3    Records.) However, the warning states that alcoholism "may cause the patient to ignore certain

4    necessary limitations and precaution in the use of the prosthesis, leading to failure or other

5    complications." (Gray Decl. ¶31, Ex. X: IFU.) Dr. Bozic has clearly stated that no such compliance

6    issues existed. (Gray Decl. ¶12, Ex. E: Bozic Rebuttal.) There was also no problems with other

7    complications like dislocation or mechanical loosening. (*Id.*)

8    Under Adverse Effects of the IFU, Wright warned that "while rare, fatigue fracture of the

9    prosthetic component can occur as a result of trauma, strenuous activity, improper alignment, or

10   duration of service." (Gray Decl. ¶31, Ex. X: IFU.) Noticeably missing from this warning was any

11   reference to weight or an increased risk with the use of the long neck. Wright knew that normal

12   daily activities in higher demand patients, which were not contraindicated by their warnings

13   increased the risk of fracture. No warning was provided to the public at large or the physicians. Even

14   their Dear Physician letter in 2008 did not provide any changes to the acceptable candidates for their

15   product. (Gray Decl. ¶33, Ex. Z: Letter to Healthcare Professionals.)

16   So the IFU did not provide an adequate or sufficient guide to a treating physician regarding

17   weight or activity. The IFU provided no warnings regarding the long necks and the increased rates of

18   fracture. Wright also did not inform surgeons of any fractures occurring and continued to produce

19   marketing materials that tout Wright's fracture free product. (Gray Decl. ¶9, Ex. B: Truman Rep.;

20   Truman Decl. ¶16-19.)

21          **C.    Dr. Bozic's extensive experience as an orthopedic surgeon, with a background in
22                  biomechancial engineering does not make Wright's warnings adequate**

23   Dr. Bozic is an experienced orthopedic surgeon, a biomechanial engineer and he holds an

24   M.BA. (Gray Decl. ¶11, Ex. D: Bozic Report.) Dr. Bozic has performed research on, lectures on, and

25   writes on total hip arthroplasties. (*Id.*) These studies have included the effect of weight on implant

26   successes. (*Id.*) Even with this impressive resume, the only party in control of information regarding

27   the inadequate testing of their long necks and the data regarding fractures of the long necks was

28

CASSEL MALM FAGUNDES
6 S. El Dorado St., Suite 315
Stockton, CA 95202
(209) 870-7900
PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON ALL CAUSES OF
ACTION                                          20                                      00099996.WPD

1   Wright . It was Wright who did not provide warnings or notice regarding this knowledge. It was

2   Wright who was responsible for the design and testing of the device to provide warnings that should

3   sufficiently warn a surgeon of groups within the population to avoid using the manufacturer's device

4   in.

5        As a treating physician and orthopedic surgeon, Dr. Bozic reasonably expected that a

6   designer and manufacturer like Wright would be aware of the medical literature and account for such

7   in the design of their device. (Bozic Decl. ¶12.) He expected that the device would be designed and

8   manufactured so that it could withstand forces that are encountered in the activities of everyday life.

9   (*Id.* at ¶11.) He reasonably expected that the manufacturer would design the implant in such a way

10   and to such specification that the modular neck would not fracture during Mr. Tucker's routine

11   activities. (*Id.* at ¶9.)

12       **D.**    **The discussion of risks and benefits of the a total hip arthroplasty does not**

13                **absolve Wright from failing to warn regarding known fractures or to provide**
             **adequate warnings concerning the use of the long neck in heavier individuals**

14        Dr. Bozic selected the ProFemur hip because of the ceramic-ceramic bearing. (Gray Decl.

15   ¶11, 27, Ex. D: Bozic Rep., Ex. T: UCSF Med. Records; Bozic Decl. ¶6-7.) At the time their were

16   limited options and it was thought to be better for use in larger individuals. In the discussion

17   regarding the different options, Dr. Bozic discussed the possibility of fracture. (*Id.*) However, the

18   discussion did not revolve around the fracture of the long neck, but the fracture of the ceramic

19   materials within the device. (*Id.*)

20        The signing of informed consents and discussion of risks of surgery did not absolve Wright

21   of liability. The warnings and informed consent did not include the knowledge of the increased risk

22   of fracture of the long neck, because only Wright had that knowledge from their testing and actual

23   fractures that occurred before 2006. Wright's warnings did not reflect this knowledge and they did

24   not inform Dr. Bozic of this knowledge. (Gray Decl. ¶25, Ex. R: Wright Modular Neck Rep.; Bozic

25   Decl. ¶13.)

26   ///

27   ///

28

CASSEL MALM FAGUNDES
6 S. El Dorado St., Suite 315
Stockton, CA 95202
(209) 870-7900

E.   **If Wright had warned Dr. Bozic of weight limitations or the fracture of the device, Dr. Bozic would not have selected the Profemur Device with a long neck**

If Wright had warned Dr. Bozic of the increased risk of fracture in heavier individuals, Dr. Bozic would not have used the Profemur Hip Prothesis. (Bozic Decl. ¶15.) This within a treating physicians knowledge regarding the treatment of Mr. Tucker. (*Id.*) Additionally, Dr. Bozic stopped using the Profemur Modular implant in his patients after the second fracture of the device within his patients. (Bozic Decl. ¶16.)The second fracture was Mr. Tucker's. (*Id.*) Wright's documents show that Wright knew of 12 neck breakages with 5 related to fretting and at least 4 occurring in larger patients. Even if we only stick to Wright's 2 acknowledged fractures, Dr. Bozic's actions show that if Wright had informed Dr. Bozic of at least the 2 acknowledged fractures, Dr. Bozic would not have used the Profemur device. (Bozic Decl. ¶16.)

Wright has failed to warn under the strict liability and negligent standards. Wright failed to inform the treating physician of the fractures associated with the device, failed to inform the treating physician of the inadequacy of their testing, and failed to contraindicate the use of the device in Mr. Tucker. Had Wright informed Dr. Bozic about these issues, he would not have used Wright's Profemur Hip System and Mr. Tucker would have suffered the injuries caused by Wright's fracture long neck.

IX.  **MRS. TUCKER'S LOSS OF CONSORTIUM CLAIM IS A DERIVATIVE OF MR. TUCKER'S ACTIONS AND IS A SEPARATE MARITAL INTEREST THAT DOES NOT REQUIRE AN EXPERT'S TESTIMONY**

In *Rodriquez v. Bethlehem Steel Corp.*, 12 Cal. 3d. 382 (1974), the California Supreme Court recognized the that each spouse has a cause of action for loss of consortium caused by a negligent or intentional injury to the other spouse by a third party. A loss of consortium includes the loss of support, services, love, companionship, affection, society, sexual relations, moral support, solace and more." (*Id.* at 404.)  This marital interest arises out of the marital relationship. (*Id.* at 401, 404; *See Mealy v. B-Mobile*, 195 Cal. App. 4th 1218, 1224. (2011).) In contrast, a claim for mental pain and suffering does not require a marital relationship and generally involves recovery for "fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment,

1  apprehension, terror or ordeal." (*Rodriquez*, 12 Cal. 3d. at 402.)

2      Plaintiff Rebecca Tucker is the wife of Mr. Tucker. Mrs. Tucker has made a loss of

3  consortium claim as part of the original complaint. The stipulation that was signed did not extinguish

4  her loss of consortium claim, but clarified that she was not also seeking separate damages for mental

5  pain and suffering. (Doc No. 44.) In this case, Mrs. Tucker's marital interests were affected by the

6  failure of the ProFemur Hip. The intimacy and sexual relations within the marriage were

7  significantly affected. (Gray Decl. ¶24, Ex. Q: Tucker Dep. 76-80.) After Mr. Tucker's failed hip, he

8  was fearful and took out his frustrations on Mrs. Tucker. (Gray Decl. ¶23, Ex. P: Mrs. Tucker's

9  Response to Special Interrogatories 4:16-5:17.) Mr. Tucker would become upset at little things and

10 was prone to ranting, being angry, self-righteous and threatening. (*Id.*) This change in character was

11 disturbing to Mrs. Tucker and put a heavy strain on the marriage. (*Id.*) Her husband became more

12 depressed because of the situation. As a result, Mrs. Tucker has been left feeling bereft of Mr.

13 Tucker's affection and tenderness that she had previously known. (*Id.* at 5:5-11.)

14     The strains and damages to the marriage are present in the record. Mrs. Tucker has suffered

15 damage to her marital interest because of Wright's defective hip system that injured her husband,

16 Mr. Tucker. No expert is needed for damages, as the ability to comprehend and understand the loss

17 of a marital interest is within the common experience and understanding of the jury, similar to how

18 they determine damages for pain and suffering. the Jury will be able to determine the amount of

19 compensation for the lost interest. The claim is appropriate and viable and is a derivative of Mr.

20 Tucker's causes of actions. Since Mr. Tucker's claims will not be dismissed by Wright's motion,

21 Mrs. Tucker's claims should defeat summary judgment.

22 **X.    CONCLUSION**

23     Wright's motion for summary judgment on all causes of action should be denied. The record

24 shows that genuine issues of fact exist among all causes of action, and a reasonable jury could and

25 should find for the Plaintiffs. The plaintiffs have presented admissible expert testimony that the risks

26 of the titianium alloy long neck outweighed the benefits. There were safer alternatives available that

27 would not have been cost prohibitive that would have allowed Wright to substantially reduce the risk

28

1 of fretting and fracture. The experts have further stated that there is also no way to rule out a

2 manufacturing defect contributed to the failure of the device.

3      With regards to the failure to warn claim, there is testimony from the treating physician and

4 experts that Wright's warnings were not adequate. Dr. Bozic was never informed by Wright

5 regarding the limitations of their testing or that there were actual fractures of the device in

6 individuals like Mr. Tucker. In fact, had Wright informed Dr. Bozic he would have selected another

7 hip system for Mr. Tucker. Dr. Bozic's actions support this because after only two fractures of the

8 device in his patients, he stopped using Wright's devices altogether. The expert testimony goes

9 further and provides examples of competitors, goes into details of how the testing was inadequate,

10 and that the warnings did not provide any guidelines or specific limitations that would have limited

11 the use from higher demand patients like Mr. Tucker. The warnings themselves did not

12 contraindicate the use in Mr. Tucker.

13      Finally, Mrs. Tucker's loss of consortium claim should remain alive as a derivative of Mr.

14 Tucker's claim. Mrs. Tucker's marital interest is separate from a claim for "mental pain and

15 suffering," but like "mental pain and suffering," and is something within the understanding and

16 experience of the jury that does not need an expert to describe the injury.

17      Wherefore, the Plaintiffs respectfully request this court to deny the defendant's motion for

18 summary judgment.

19

20 Dated: December 18 , 2012      CASSEL MALM FAGUNDES

21

22      By: _Joseph Fagundes_ BY THG

23      Joseph H. Fagundes
     Attorneys for Plaintiffs

24      GREGORY K. TUCKER and REBECCA
     TUCKER

25

26

27

28